**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **FRESH & EASY, LLC,** | : | **Case No. 15-12220 (BLS)** |
| | : | |
| Debtor. | : | |
| | : | |
| **THE OFFICIAL COMMITTEE OF** | : | **Adversary No. _____** |
| **UNSECURED CREDITORS, on** | : | |
| **behalf of the bankruptcy estate of** | : | |
| **FRESH & EASY, LLC,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **YFE HOLDINGS, INC.,** | : | |
| **FRESH FOODS, LLC, FEFOS, LLC,** | : | |
| **RONALD W. BURKLE, IRA L.** | : | |
| **TOCHNER, ROBERT P.** | : | |
| **BERMINGHAM, and** | : | |
| **JAMES W. KEYES,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORIGINAL COMPLAINT AND CLAIM OBJECTIONS

The Official Committee of Unsecured Creditors (the "Committee"), asserting claims derivatively on behalf of Fresh & Easy, LLC (the "Debtor"), the debtor in the above-captioned bankruptcy case, brings this action against Defendants YFE Holdings, Inc., Fresh Foods, LLC, FEFOS, LLC, Ronald W. Burkle, Ira L. Tochner, Robert P. Bermingham, and James W. Keyes (collectively, the "Defendants"), and alleges as follows:

### NATURE OF THIS ACTION

1.     In late 2013, Ronald W. Burkle ("Burkle") formed the Debtor to take on the operations of a failed grocery-store chain.  This chain had reportedly lost about $2 billion over seven years.  The stores fared little better after Burkle took them over than they had before, even though Burkle supposedly took on the stores to improve their operations and save employees' jobs.

2.     Burkle knew the stores were a financial disaster, so he refused to put any of his own money at risk.  He used other peoples' money to fund the losing operations for about two years. But knowing that the stores would eventually use up all available cash and wind up in bankruptcy, Burkle caused the Debtor to give away, for free, its only valuable hard assets — 19 stores, unencumbered and held in fee simple — to an affiliate, also indirectly owned by Burkle.

3.     ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

4.     Burkle took no risk on this failing enterprise.  Instead, the Debtor's creditors took on the risk that the Debtor would fail, and it did.  The Debtor now faces over $100 million in unsecured general creditor claims.

5.     By this action, the Committee seeks the return of the 19 stores Burkle has not already sold, and the proceeds from sales of the other stores, and it seeks to remedy several other abuses Burkle and those working for him have inflicted on the Debtor, to the detriment of its creditors.

## JURISDICTION AND VENUE

6.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).  This action is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Pursuant to Federal Rule of Bankruptcy Procedure 7008, if any part of this action is found to be non-core, the Committee consents to entry of final orders and/or judgment by this Court.

7.     The Court has personal jurisdiction over all of the Defendants in this action because:  (a) the Defendants have sufficient contacts with the United States to be subject to nationwide service of process under Federal Rule of Bankruptcy Procedure 7004; (b) the Defendants are or were either companies formed under Delaware law or officers, directors, and/or managers of companies formed under Delaware law, including the Debtor and its parent entity, YFE Holdings, Inc.; and (c) the Defendants, through their continuous and systematic contacts with Delaware, have purposefully availed themselves of the benefits of Delaware's laws and should reasonably anticipate being haled into court in Delaware.

8.     Venue is proper in this Court under 28 U.S.C. § 1409(a).

## PARTIES

9.     The Committee was appointed in the above-captioned bankruptcy case by the United States Trustee pursuant to 11 U.S.C. § 1102.  The Committee has contemporaneously filed a motion in the above-captioned bankruptcy case seeking standing, on behalf of the Debtor, to assert the claims and objections alleged in this action because: (a) the Committee has alleged colorable claims and objections that would benefit the estate; and (b) the Debtor has refused to pursue, and is prohibited by the interim order authorizing post-petition financing (Docket No. 74) from pursuing, such claims and objections.

10.     YFE Holdings, Inc. ("YFE") is a Delaware corporation with its principal place of business at 9130 West Sunset Boulevard, Los Angeles, California 90069.  YFE is the sole and managing member of the Debtor, Fresh Foods, LLC, and FEFOS, LLC.

11.     Fresh Foods, LLC ("Fresh Foods") is a Delaware limited liability company with its principal place of business at 9130 West Sunset Boulevard, Los Angeles, California 90069.

12.     FEFOS, LLC ("FEFOS") is a Delaware limited liability company with its principal place of business at 9130 West Sunset Boulevard, Los Angeles, California 90069.

13.     Ronald W. Burkle ("Burkle") is an individual who resides in California.  Burkle is YFE's majority shareholder and controls all of YFE's voting stock.  ████████████

████████████████████████

14.     Ira L. Tochner ("Tochner") is an individual who resides in California.  Tochner served as a director of YFE from September 2013 to present.

15.     Robert P. Bermingham ("Bermingham") is an individual who resides in California.  Bermingham served in the following capacities:  (a) as a director and officer of YFE from September 2013 to present; (b) as a manager and officer of the Debtor from September 2013 to August 2015; (c) as a manager and officer of Fresh Foods from September 2013 to present; and (d) as an manager and officer of FEFOS from March 2014 to present.

16.     James W. Keyes ("Keyes") is an individual who resides in Texas.  Keyes served in the following capacities:  (a) as a director and officer of YFE from September 2013 to present; (b) as a manager and officer of the Debtor from September 2013 to October 2015; (c) as a manger and officer of Fresh Foods from September 2013 to present; and (d) as a manager and officer of FEFOS from March 2014 to present.

17.     YFE, Burkle, Tochner, Bermingham, and Keyes are collectively referred to in this action as the "Burkle Insiders."

## FACTUAL BACKGROUND

**A.     The Burkle Insiders Caused the Debtor to Purchase a Distressed Grocery Chain.**

18.     The Debtor's underlying business — a grocery chain focusing on high quality, freshly prepared, and ready-to-eat products — was founded in 2006 by Tesco PLC ("Tesco"), a large grocery retailer based in the United Kingdom.

19.     This grocery chain was financially distressed throughout its short existence. It entered into above-market leases and failed to attract a sufficiently broad customer base. As a result, the grocery chain never generated a profit and suffered losses of approximately $250 million per year. After Tesco had reportedly lost more than $2 billion on this venture, the grocery chain filed a chapter 11 bankruptcy case in September 2013. *See In re Fresh & Easy Neighborhood Market Inc., et al.*, Case No. 13-12569 (KJC) (Bankr. D. Del.).

20.     Burkle, a billionaire supermarket magnate, described this grocery chain as suffering "horrifying" losses. Burkle, however, recognized an opportunity to obtain this distressed business, including some of its more valuable assets, without using any of his own money and without assuming any risk.

21.     Burkle formed YFE to serve as the stalking horse bidder for this grocery chain. ■

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████     Yet YFE, ███████████████████, proposed to purchase 181 stores, as well as certain food production and distribution facilities.

22.     But recognizing this grocery chain's dismal financial performance, Burkle refused to put any of his money at risk.  YFE agreed to "purchase" the assets by assuming massive leases and other liabilities associated with the chain's operations, and by granting warrants for Tesco to purchase a minority interest in YFE.  So eager was Tesco to unload this failed grocery chain that it did not require any cash payment to Tesco from YFE or Burkle in the proposed sale.  In fact, Tesco even agreed to provide a $120 million loan secured by the food production facilities.  No other party was willing to make a competing bid.  The bankruptcy court approved this sale in November 2013.

23.     After obtaining this approval, but prior to closing, YFE formed two subsidiaries: (a) the Debtor; and (b) Fresh Foods.  At closing in late 2013, YFE then divvyed up the acquired assets and liabilities among itself, its two subsidiaries, and an entity formed by Fortress Investment Group, LLC ("Fortress"), as follows:

- Fortress received a minority interest in YFE, received fee-simple title to the distribution facility and 14 non-operating stores, and transferred $106 million in cash to the Debtor;

- Fresh Foods received fee-simple title to the food production facilities, borrowed $120 million under a secured note from Tesco (the "Tesco Note"), and entered into a $55 million credit agreement with Wells Fargo;

- The Debtor received fee-simple title to 19 stores (the "Fee-Owned Stores"), assumed all leases as to the remaining 162 stores and the Fortress-owned distribution facility, received $119 million in cash (which included the $106 million in cash from Fortress), and provided an unsecured guaranty for the Tesco Note; and

- ███████████████████████████████████████████████

According to Burkle, this grocery chain "was in a free fall," and Tesco "decided to literally give us" the business "to see if we could save . . . their investment."

24.    In anticipation of closing this transaction, Burkle implemented the following ownership and management structure for the various entities:



As reflected above, Burkle owned not only a majority equity interest in ███████████ ████████████████████████████████████████████████████ YFE, in turn, served as the managing member for the Debtor and Fresh Foods.

25.    Burkle staffed YFE and its subsidiaries with persons loyal to and paid by him. Burkle appointed Tochner to YFE's board of directors. ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████ ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

26.     Through his majority equity interest in YFE, his position on YFE's board of directors, and the appointment of his close associates to fill other positions for YFE and its subsidiaries, Burkle had complete control over these entities.  Moreover, both before and after Burkle stepped down from the YFE board, he exercised actual control over YFE and its subsidiaries, making decisions regarding both broad strategies and minute details of the Debtor's operations and YFE's attempts at financing.

**B.     The Debtor Persistently Sustained Massive Losses and Was Insolvent.**

27.     Under the management of the Burkle Insiders, the operation of the stores caused the Debtor to suffer significant and recurring losses.  The stores were a complete financial disaster before the Burkle Insiders caused the Debtor to purchase them, and the massive losses continued thereafter.

28.     ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

29.     Given the Debtor's staggering losses, the Burkle Insiders candidly expressed concern about the Debtor's financial survival.  ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

  ███████████████████████████████████

  █████████████████

  ███████████████████████████████████

  ███████████████████████████████

  ███████████████████████████████████

  ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

30.     So great were the Debtor's losses, and so dim its prospects to become profitable, that the Debtor was insolvent within just a few months of beginning operations (if it were ever solvent).  YFE's own paid consultant made this determination.

31.     ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████.

32. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████

33. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████

34. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

**C.     The Burkle Insiders Caused the Debtor to Transfer the Fee-Owned Stores to FEFOS for No Consideration.**

35.     In late April 2014, as the Debtor's losses mounted, the Burkle Insiders caused the Debtor to transfer the Fee-Owned Stores (the "<u>Transfer</u>") to FEFOS, a newly formed and wholly-owned YFE subsidiary. ███████████████████████████

██████████████████████████

  ▮      ██████████████████████
         ████

  ▮      ████████████████████

  ▮      █████████████████████

  ▮      ██████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

███████████████████████████

37.     The Debtor received no benefit from the Transfer. █████████████

████████████████████████████

████████████████████████████

████████████████████████████

██████████████████

11

38.     This rationale for the Transfer, moreover, reflects the essence of a fraudulent transfer. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████.

39.     ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████

██     ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ Nonetheless, the Burkle Insiders caused the Debtor to "borrow" ██████████████ from FEFOS at a 7% interest rate, pursuant to a promissory note dated October 2, 2015 (the "<u>FEFOS Note</u>").

41.     ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[REDACTED]

**D.     The Burkle Insiders Engaged in Mismanagement and Self-Dealing as the Debtor Collapsed into Bankruptcy.**

42.     On October 30, 2015 (the "Petition Date"), the Debtor filed the above-captioned bankruptcy case, owing more than $100 million to its creditors.

43.     In the final days before the Petition Date, the Burkle Insiders caused the Debtor to terminate thousands of its employees, thereby exposing the Debtor to potential liability under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "WARN Act") and California Labor Code § 1400 *et seq.* (the "California WARN Act").   The Debtor was subsequently sued in two putative class action on behalf of its former employees, alleging that the Debtor did not provide its employees with the requisite 60-day advance notice of termination under the WARN Act and the California WARN Act.  *See Cote v. Fresh & Easy, LLC, et al.*, Adv. No. 15-51906 (BLS) (Bankr. D. Del.); *Chan v. Fresh & Easy, LLC, et al.*, Adv. No. 15-51997 (BLS) (Bankr. D. Del.).  The Burkle Insiders could and should have acted to cause the Debtor to issue the appropriate notices in order to avoid this significant potential liability.

44.     [REDACTED]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

45.    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

**E.    The Burkle Insiders Now Threaten to Plunder FEFOS.**

46.    The Burkle Insiders are poised to plunder FEFOS of the Fee-Owned Stores and their sale proceeds, thereby irreparably harming the Debtor and its estate.

47.    ████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

48.    ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ he Committee requested a standstill agreement from FEFOS and the Burkle Insiders:  (a) FEFOS would continue to market and sell the Fee-Owned Stores; and (b) FEFOS would hold all sale proceeds from the Fee-Owned Stores, pending further discussions with the Committee regarding its potential claims to such proceeds.  The Committee contends that FEFOS and the Burkle Insiders informally consented to this standstill agreement in January 2016.

49.    The Committee recently requested that FEFOS and the Burkle Insiders reaffirm this standstill agreement.  On May 18, 2016, the day before their first mediation session, counsel for the Committee asked counsel for FEFOS and the Burkle Insiders to reaffirm the standstill agreement.  However, counsel for FEFOS and the Burkle Insiders declined to do so, saying that he would need to speak with his clients. Since then, the insiders have made clear that they believe no agreement is in effect.  They refuse to affirm that even an informal agreement exists, and they certainly refuse to formalize any agreement.

50.    The Burkle Insiders do not have any legitimate reason to decline entering or reaffirming a standstill agreement, unless they intend to divert the proceeds from the Fee-Owned

Stores for other purposes. ████████████████████████████████████

████████████ The Burkle Insiders, moreover, face an immediate need for additional cash in order to

satisfy an upcoming payment obligation owed by Burkle to Tesco. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ The

Burkle Insiders, upon information and belief, intend ███████████████████ using some

of the sale proceeds from the Fee-Owned Stores, and their refusal to affirm a standstill agreement

indicates that they may have already transferred funds out of FEFOS and to YFE.

51.     The Committee and the estate would be irreparably harmed by any further

dissipation of the Fee-Owned Stores or their sale proceeds.  FEFOS received the Fee-Owned Stores

through a fraudulent transfer by the Debtor.  The Committee asserts fraudulent transfer claims on

behalf of the Debtor's estate seeking to recover the Fee-Owned Stores or their sale proceeds from

FEFOS. ████████████████████████████████████████.

## CAUSES OF ACTION

### Count One
### Breach of Fiduciary Duty
### Against the Burkle Insiders

52.     The Committee re-alleges the allegations in paragraphs 1-51.

53.     The Burkle Insiders each owed fiduciary duties of care and loyalty to the Debtor

based on their positions of control and responsibility at the Debtor, their ability to exercise control

over the Debtor, and their actual exercise of control over the Debtor.

---

[1] ████████████████████████████████████████████████
████████████████████████

54.    The Burkle Insiders breached their fiduciary duty of care to the Debtor in multiple ways, including as follows:

a.    The Burkle Insiders breached their duty of care by acting with gross negligence and with reckless indifference in causing the Debtor to transfer the Fee-Owned Stores to FEFOS for no consideration, by ███████████████████ ██████████████████████████, and/or by failing to return or cause the return of the Fee-Owned Stores after the Transfer.

b.    The Burkle Insiders breached their duty of care by acting with gross negligence and reckless indifference in causing the Debtor to pay ████████████ ██████████████████.

c.    The Burkle Insiders breached their duty of care to the extent that they acted with gross negligence and with reckless indifference in failing to cause the Debtor to timely issue appropriate WARN Act notices.

55.    The Burkle Insiders breached their fiduciary duty of loyalty in multiple ways, including as follows:

a.    The Burkle Insiders were on both sides of the Transfer of the Fee-Owned Stores because their own interests competed with the Debtor's (as in the case of YFE and Burkle), because they were beholden to or aligned with Burkle, and/or because they had fiduciary duties to the Debtor, FEFOS, and YFE. They thus had irreconcilable interests or obligations where the interests of the Debtor diverged from FEFOS, YFE, or Burkle, as they did with respect to the Transfer. Their decisions to cause the Debtor to transfer the Fee-Owned Stores to FEFOS for no consideration, their refusal to return the Fee-Owned Stores, and their refusal to use the Fee-Owned Stores to finance the Debtor, were not done in good faith and were not fair to the Debtor.

b.    The Burkle Insiders were on both sides of the YFE Transfers (defined and discussed in paragraphs 86-89, below) because their own interests competed with the Debtor's (as in the case of YFE and Burkle), because they were beholden to or aligned with Burkle, and/or because they had fiduciary duties to the Debtor and YFE. The Burkle Insiders, or persons working at their direction, caused the Debtor to characterize (to the detriment of the Debtor and its creditors) the YFE Transfers as debt rather than equity. This conduct was not done in good faith and was not fair to the Debtor.

c.    The Burkle Insiders were on both sides of the FEFOS Note because their own interests competed with the Debtor's (as in the case of YFE and Burkle), because they were beholden to or aligned with Burkle, and/or because they had fiduciary duties to the Debtor, FEFOS, and YFE. They

17

thus had irreconcilable interests or obligations where the interests of the Debtor diverged from FEFOS, YFE, or Burkle, as they did with respect to the FEFOS Note.  The Burkle Insiders' decision to cause the Debtor to borrow money at a 7% interest rate from FEFOS ████████████ ██████████████████████████ was thus not made in good faith and was not fair to the Debtor.

56.    These breaches of fiduciary duty proximately caused damages to the Debtor and its estate, including damages in the amount of:  (a) the value of the Fee-Owned Stores; (b) █████ ███████████████████████████████████████████; (c) whatever judgment, settlement, or other claims that the Debtor pays because of any WARN Act liability; (d) any amounts that the Debtor may owe to YFE because of the YFE Transfers; and (e) any interest the Debtor may owe to FEFOS on the FEFOS Note.

**<u>Count Two</u>**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against Burkle and Tochner**

57.    The Committee re-alleges the allegations in paragraphs 1-56.

58.    Burkle and Tochner knew that YFE (as the Debtor's managing member), Keyes (as the Debtor's CEO and a member of its board of managers), and Bermingham (as the Debtor's officer, counsel, and member of its board of managers) owed fiduciary duties to the Debtor.

59.    Burkle and Tochner knew that YFE, Keyes, and Bermingham were breaching their fiduciary duties to the Debtor, as described above in Count One.

60.    Burkle and Tochner knowingly and substantially assisted YFE, Keyes, and/or Bermingham in breaching their fiduciary duties in various ways, including by:

a.    Voting in favor of and causing the Transfer of the Fee-Owned Stores;

b.    █████████████████████████████████████████

c.    Approving of or causing the making of the FEFOS Note; and

> d.     Approving of or causing the improper characterization of the YFE Transfers (defined and discussed in paragraphs 86-89, below) as made pursuant to a debt instrument.

61.    By aiding and abetting these breaches of fiduciary duty, Burkle and Tochner proximately caused damages to the Debtor and its estate, including damages in the amount of: (a) the value of the Fee-Owned Stores; (b) ███████████████████████████████████ ██████████████; (c) whatever judgment, settlement, or other claims that the Debtor pays because of any WARN Act liability; (d) any amounts that the Debtor may owe to YFE because of the YFE Transfers; and (e) any interest the Debtor may owe to FEFOS on the FEFOS Note.

**<u>Count Three</u>**
**Avoidance of Actual Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A),**
**11 U.S.C. § 544(b), and Cal. Civ. Code § 3439.04(a)(1)**
**Against FEFOS and YFE**

62.    The Committee re-alleges the allegations in paragraphs 1-51.

63.    The Transfer of the Fee-Owned Stores to FEFOS constituted a transfer of the Debtor's interest in property.

64.    The Transfer was made within two years of the Petition Date.

65.    The Transfer was made with the actual intent to hinder, delay, or defraud creditors to which the Debtor was or became indebted to on or after the date of the Transfers. The Debtor's actual intent to defraud creditors is evidenced by, *inter alia*, the following facts,:

> a.     The Debtor was insolvent at the time of the Transfer;

> b.     The Debtor was suffering millions of dollars in monthly losses at the time of the Transfer;

> c.     The Debtor was quickly depleting its liquidity at the time of the Transfer;

> d.     The Transfer was made for no consideration and provided no benefit to the Debtor, as the Burkle Insiders specifically intended;

e. ████████████████████████████████████████

f. ████████████████████████████████████████ and

g. FEFOS is wholly owned by the same entity that owned the Debtor, such that the Debtor's equity holder never lost beneficial use of the Fee-Owned Stores, even though they were put beyond reach of the Debtor's creditors.

66. Pursuant to 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544(b) and applicable state law, including Cal. Civ. Code § 3439.04(a)(1), the Committee is entitled to judgment on behalf of the Debtor's estate avoiding the Transfer as a fraudulent transfer.

**Count Four**
**Constructive Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(B),**
**11 U.S.C. § 544(b), and Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05**
**Against FEFOS and YFE**

67. The Committee re-alleges the allegations in paragraphs 1-51.

68. The Transfer of the Fee-Owned Stores to FEFOS constituted a transfer of the Debtor's interest in property.

69. The Transfer was made within two years of the Petition Date.

70. The Debtor received less than reasonably equivalent value in exchange for the Transfer. Indeed, the Debtor received no value whatsoever for the Transfer.

71. At the time of or as a result of the Transfer, the Debtor: (a) was insolvent in that, at a fair valuation, the sum of the Debtor's liabilities were greater than the sum of the Debtor's assets; (b) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or transaction; and (c) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as they came due.

72.     Pursuant to 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b) and applicable state law, including Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05, the Committee is entitled to judgment on behalf of the Debtor's estate avoiding the Transfer as a fraudulent transfer.

### Count Five
### Recovery of Avoided Transfers Under 11 U.S.C. § 550
### Against FEFOS

73.     The Committee re-alleges the allegations in paragraphs 1-51 and 62-72.

74.     The Transfer is avoidable under (a) 11 U.S.C. § 548; and (b) 11 U.S.C. § 544(b) and applicable state law, including Cal. Civ. Code §§ 3439.04(a) and 3439.05.

75.     FEFOS received the Fee-Owned Stores in the Transfer as the initial transferee.

76.     Pursuant to 11 U.S.C. § 550(a), the Committee is entitled to a judgment on behalf of the Debtor's estate, requiring FEFOS to return the Fee-Owned Stores or the value thereof, including any proceeds from the sale of the Fee-Owned Stores.

### Count Six
### Recovery of Avoided Transfers Under 11 U.S.C. § 550
### Against YFE

77.     The Committee re-alleges the allegations in paragraphs 1-51 and 62-72.

78.     The Transfer is avoidable under (a) 11 U.S.C. § 548; and (b) 11 U.S.C. § 544(b) and applicable state law, including Cal. Civ. Code §§ 3439.04(a) and 3439.05.

79.     FEFOS received the Fee-Owned Stores in the Transfer as the initial transferee. YFE received proceeds from sale of the Fee-Owned Stores as a subsequent transferee.  YFE did not receive the sale proceeds in good faith and without knowledge as to the voidability of the Transfer itself.

80.    Pursuant to 11 U.S.C. § 550(a), the Committee is entitled to a judgment on behalf of the Debtor's estate, requiring YFE to return any proceeds that it received from the sale of the Fee-Owned Stores.


**Count Seven**
**Corporate Waste**
**Against the Burkle Insiders**

81.    The Committee re-alleges the allegations in paragraphs 1-51.

82.    The Burkle Insiders, through their positions of authority, control, and responsibility over the Debtor, wasted its valuable corporate assets by, *inter alia*, causing the Debtor to transfer the Fee-Owned Stores to FEFOS for no consideration and ███████████████████████████ ███████████████████████████████████.

83.    These transactions were so one-sided that no business person of ordinary, sound judgment could conclude that the Debtor received adequate consideration in connection with the transactions.  Rather, the transactions essentially resulted in gifts to FEFOS and FAEMF.

84.    These acts of corporate waste proximately caused damages to the Debtor and its estate, including damages in the amount of:  (a) the value of the Fee-Owned Stores; and (b) ██ ██████████████████████████████████████████████.


**Count Eight**
**Recharacterization of Claim**
**Against YFE**

85.    The Committee re-alleges the allegations in paragraphs 1-51.

86.    The Debtor's schedules list an intercompany unsecured, non-priority claim held by YFE in the amount of $89,462,027 (the "YFE Claim").

87.    The YFE Claim is based on ███████████████████████████

████████████████████████████████████████████████████████████

88.    YFE did not make the YFE Transfers pursuant to any legitimate debt instrument.

████████████████████████████████████████████████████████████

███████████████████████████████████ Yet, even if the YFE Transfers were made pursuant to the Demand Note, the YFE Transfers constituted equity infusions, not transfers pursuant to a debt instrument, for many reasons, including the following:



89.    No other ostensible debt instrument exists that could possibly relate to the YFE Transfers. ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

90.     Considering the totality of the circumstances, the YFE Transfers were equity investments, rather than debt, and the Debtor does not owe any debt obligation related to the YFE Transfers or any purported "interest" on the YFE Transfers.  Accordingly, the YFE Claim should be recharacterized as equity.

**Count Nine**
**Equitable Subordination of Claims Under 11 U.S.C. § 510(c)**
**Against FEFOS, YFE, and Fresh Foods**

91.     The Committee re-alleges the allegations in paragraphs 1-61.

92.     The Debtor's schedules list the following unsecured intercompany claims:

    a.      An $89,462,027 intercompany claim in favor of YFE, based on the YFE Transfers;

    b.      A $4,902,183 intercompany claim in favor of FEFOS, based on the FEFOS Note; and

    c.      A $9,415,096 intercompany claim in favor of Fresh Foods, based on a note made in favor of Fresh Foods and dated September 11, 2015.

93.     YFE and FEFOS engaged in inequitable conduct.   Among other misconduct detailed above, YFE caused the Debtor to transfer the Fee-Owned Stores to FEFOS for no consideration, while the Debtor was insolvent, and to the detriment of creditors.  Moreover, after the Debtor transferred the Fee-Owned Stores to FEFOS for free, FEFOS then charged the Debtor interest when loaning the Debtor funds ████████████████████████████████

94.     Fresh Foods, YFE, and FEFOS are all directly or indirectly owned by Burkle, and any recovery by these entities on their alleged debts will benefit Burkle to the detriment of

creditors.  Yet Burkle, as discussed above, has acted inequitably at every turn, stripping assets out of the Debtor, knowing that doing so will reduce creditor recoveries.

95.     The inequitable conduct of YFE, FEFOS, and Fresh Foods not only injured the Debtor and its creditors, but also conferred an unfair advantage on YFE, FEFOS, and Fresh Foods.

96.     Equitable subordination of the claims held by YFE, FEFOS, and Fresh Foods is not inconsistent with the Bankruptcy Code.  Rather, equitable subordination of these claims redresses the underlying inequitable conduct that directly harmed the Debtor and its creditors.

97.     Accordingly, the Committee respectfully requests that the claims of YFE, FEFOS, and Fresh Foods be equitably subordinated to the claims of all other creditors pursuant to 11 U.S.C. § 510(c).

## Count Ten
### Objection to Claims by YFE

98.     The Committee re-alleges the allegations in paragraphs 1-61.

99.     Claims have been filed and/or scheduled on YFE's behalf in the Debtor's bankruptcy case, including the YFE Claim.

100.    The Committee hereby objects to the YFE Claim because:  (a) the YFE Claim should be equitably subordinated under 11 U.S.C. § 510(c); (b) the YFE Claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against YFE in this action; and (c) the YFE Claim should be disallowed under 11 U.S.C. § 502(d) based upon the causes of action asserted against YFE in this action, including the causes of action under 11 U.S.C. § 544, 548, and 550.

## Count Eleven
### Objection to Claims by FEFOS

101.    The Committee re-alleges the allegations in paragraphs 1-61.

102.    Claims have been filed and/or scheduled on behalf of FEFOS in the Debtor's

bankruptcy case, including a $4,902,183 claim based on the FEFOS Note (the "FEFOS Claim").

103.    The Committee hereby objects to the FEFOS Claim because:  (a) the FEFOS Claim

should be equitably subordinated under 11 U.S.C. § 510(c); (b) the FEFOS Claim is subject to set

off, recoupment, and/or withholding based upon the causes of action asserted against FEFOS in

this action; and (c) the FEFOS Claim should be disallowed under 11 U.S.C. § 502(d) based upon

the causes of action asserted against FEFOS in this action, including the causes of action under 11

U.S.C. § 544, 548, and 550.

**Count Twelve**
**Injunctive Relief**

104.    The Committee re-alleges the allegations in paragraphs 1-51 and 62-80.

105.    The Debtor and its estate will suffer immediate and irreparable harm if FEFOS

transfers the Fee-Owned Stores or the proceeds from selling the Fee-Owned Stores to YFE or any

other entity.  As demonstrated above, the Fee-Owned Stores and their proceeds are recoverable for

the benefit of the Debtor's estate as actual and constructive fraudulent transfers.

106.    There is be no adequate remedy at law for this harm because:  (a) ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (b) if FEFOS

transfers the Fee-Owned Stores or their proceeds to a good-faith subsequent transferee, the

Committee's ability to recover such stores or their proceeds will be impaired; and (c) if FEFOS

transfers the sale proceeds to YFE, such proceeds may become intermingled with other funds, thus

impairing the Committee's ability to impose a constructive trust and leaving the proceeds subject

to the claims of YFE's other creditors.

107.    The threatened injury to the Debtor and its estate outweighs any injury to FEFOS

or YFE caused by an order of the Court granting injunctive relief.  ▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████

█████████████████████████. FEFOS will not face any harm from retaining the Fee-Owned Stores and any proceeds from selling such stores.

108.    The Committee requests that this Court enjoin FEFOS and YFE from (a) transferring any of the Fee-Owned Stores, except as approved in advance by the Committee; (b) transferring any proceeds from the sale of the Fee-Owned Stores, except as necessary to pay any reasonable expenses in the ordinary course of business or as approved in advance by the Committee; and (c) commingling any proceeds from the sale of the Fee-Owned Stores with any other funds, except as approved in advance by the Committee.

## PRAYER

WHEREFORE, the Committee respectfully requests that the Court enter judgment in favor of the Committee and against the Defendants as follows:

a.    Awarding monetary damages on account of the breaches of fiduciary duty and corporate waste by the Burkle Insiders in an amount to be determined at trial;

b.    Awarding monetary damages on account of Burkle's and Tochner's aiding and abetting breaches of fiduciary duty in an amount to be determined at trial;

c.    Avoiding the Transfer as a fraudulent transfer;

d.    Ordering recovery by the Debtor's estate of the Fee-Owned Stores or the value thereof, including any proceeds from the sale of such stores;

e.    Recharacterizing the YFE Claim as equity;

f.    Equitably subordinating any claims filed or scheduled on behalf of YFE, FEFOS, or Fresh Foods to all claims of the Debtor's other creditors pursuant to 11 U.S.C. § 510(c);

g.    Disallowing any claims filed or scheduled on behalf of YFE, FEFOS, or Fresh Foods;

h.    Enjoining FEFOS and YFE from  (a) transferring any of the Fee-Owned Stores, except as approved in advance by the Committee; (b) transferring any proceeds

from the sale of the Fee-Owned Stores, except as necessary to pay any reasonable expenses in the ordinary course of business or as approved in advance by the Committee; and (c) commingling any proceeds from the sale of the Fee-Owned Stores with any other funds, except as approved in advance by the Committee; and

i.      All other relief, in law and in equity, to which the Committee may be entitled.


Dated:  May 31, 2016
        Wilmington, Delaware

FOX ROTHSCHILD LLP

*/s/ L. John Bird*
L. John Bird (DE No. 5310)
919 North Market Street, Suite 300
Wilmington, DE 19801
(302) 654-7444 (telephone)
(302) 656-8920 (facsimile)

-and-

Mette H. Kurth (*pro hac vice*)
1800 Century Park East, Suite 300
Los Angeles, CA  90067
(310) 598-4150 (telephone)
(310) 556-9828 (facsimile)

*Counsel to the Official Committee of*
*Unsecured Creditors*

-and-

REID COLLINS & TSAI LLP

*/s/ Eric D. Madden*
Eric D. Madden (*pro hac vice* to be filed)
J. Benjamin King (*pro hac vice* to be filed)
Gregory S. Schwegmann (*pro hac vice* to be filed)
1601 Elm Street, 42nd Floor
Dallas, TX  75201
(214) 420-8900 (telephone)
(214) 420-8909 (facsimile)

*Special Counsel to the Official Committee of*
*Unsecured Creditors*